1        UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA

2

3  SILVERTON MOUNTAIN GUIDES,     )
   LLC, an Alaska limited         )
4  liability company,             )
                                  )
5        Plaintiff,               )
                                  )
6        vs.                      )
                                  )
7  U.S. FOREST SERVICE, an        )
   agency of the U.S. Department  ) CASE NO. 3:22-cv-00048-JMK
8  of Agriculture,                )
                                  )
9        Defendant,               )
                                  )
10 and                            )
                                  )
11 PULSELINE ADVENTURE LLC,       )
                                  )
12       Defendant-Intervenor.    )
   _____)
13                                )

14           TRANSCRIPT OF ORAL ARGUMENT
   **BEFORE THE HONORABLE JOSHUA M. KINDRED, DISTRICT JUDGE**
15            Thursday - July 27, 2023
               1:03 p.m. - 2:13 p.m.
16               Anchorage, Alaska

17 **FOR THE PLAINTIFF:**
        Williams Weese Pepple & Ferguson
18      BY:  EZEKIEL J. WILLIAMS
        1801 California Street, Suite 3400
19      Denver, Colorado 80202
        303-861-4017
20

21 Clerk in attendance:  Desiree Burrell

22 _____
                    **STACY M. BALDWIN**
23              **Realtime Certified Reporter**
                **Federal Official Court Reporter**
24               222 West 7th Avenue, #4
                 Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record

```
 1   FOR THE DEFENDANT:
          DOJ-USAO Civil Division
 2        BY:  SIOBHAN MCINTYRE
          BY:  DUSTIN MICHAEL GLAZIER
 3        222 W. 7th Avenue, #9, Rm. 253
          Anchorage, Alaska 99513
 4        907-271-5071

 5

     FOR THE DEFENDANT/INTERVENORS:
 6        The Garden Law Firm PC
          BY:  KEVIN RICHARD GARDEN
 7        BY:  BOYKIN LUCAS
          66 Canal Center Plaza, Suite 505
 8        Alexandria, Virginia 22314
          703-535-5565
 9        (Appeared telephonically)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                (Call to Order of the Court at 1:03 p.m.)

 2           DEPUTY CLERK:  All rise.  His Honor, the Court, the

 3    United States District Court for the District of Alaska is now

 4    in session, the Honorable Joshua M. Kindred presiding.  Please

 5    be seated.

 6           Your Honor, we are on record in Case No.

 7    3:22-cv-00048-JMK, in Silverton Mountain Guides, LLC vs. U.S.

 8    Forest Sevice.  On the line for defendant we have Kevin Garden

 9    and Boykin Lucas.

10           And for counsel in the courtroom, please state your

11    appearance for the record.

12           MR. WILLIAMS:  Good afternoon, Ezekiel Williams, Your

13    Honor, for Silverton Mountain Guides, and with me at the table

14    is Mr. Aaron Brill for Silverton Mountain Guides.

15           THE COURT:  Good afternoon.

16           MR. WILLIAMS:  Good afternoon, Your Honor.

17           MS. MCINTRYE:  Good afternoon.  Siobhan McIntyre, here

18    for the U.S. Forest Service.  I have co-counsel Dustin Glazier

19    and Forest Supervisor Schramm here as well.

20           THE COURT:  Very well.  And just logistically, I know

21    we have some people on the line, but is it safe to assume that

22    the arguments are going to come from the attorneys that are

23    present here?

24           MS. MCINTRYE:  That's correct.

25           THE COURT:  Okay.
```

1    MR. WILLIAMS:  Except I believe, is Kevin Garden for

2 Pulseline planning to deliver an argument, because he's on the

3 phone?  I'm not aware if he is going to speak.

4    MR. GARDEN:  Yes, Your Honor.  This is Kevin Garden on

5 behalf of Defendant-Intervenor Pulseline.  And I was hoping to

6 and planning to make a presentation.

7    THE COURT:  Very well.  Well, we'll work that out

8 logistically, and I guess as a preference to the oral argument

9 today, I think, I guess I don't know for certain.  I imagine

10 that my oral argument process is a little bit different, so I

11 want to explain it to the parties.

12    Essentially what I have is, after reviewing the

13 materials, I have some questions that I would like to pose.

14 Some of the questions are for both parties, some of the

15 questions will be directed at an individual party.  Once I ask

16 all the questions and we have that discussion, what I typically

17 do is allow for each party to have about five minutes to cover

18 anything that I didn't cover through my questions.  Noting that

19 the questions, I guess, I have no desire to be coy, my

20 questions aren't rhetorical nor sardonic.  The things I want to

21 know about, I'm probably going to ask you about.

22    Not to discourage you from providing, I guess, more

23 breadth.  But, again, I like it to be efficient and I like the

24 attorneys to have some sense of what may be the pressure points

25 as to the Court's decision.

 1          One other note, I recognize that there are aspects of
 2   the, I guess the record here, that are either confidential or
 3   for attorneys' eyes only.  I don't anticipate that any -- let
 4   me be more clear.  I'm not going to ask any questions that the
 5   contents of which would violate those, I guess that protective
 6   order or those protections.  I don't know that your answers
 7   would need to either.  But if the parties feel that there is
 8   something that we need to discuss that contemplates the
 9   protected materials --
10          I guess, what I would first ask, do the parties
11   believe we need to go under seal if we have such a discussion?
12          And I'll start with you, Mr. Williams.
13          MR. WILLIAMS:  No, Your Honor, not from plaintiff.
14          THE COURT:  And from the Forest Service?
15          MS. MCINTRYE:  I suppose to some degree I would
16   coordinate with Pulseline's counsel on that.  So I would put
17   that question maybe to them first.  I don't think we have any
18   objection to putting it under seal.  To the degree that we
19   discuss the proposal packages, I know those were filed under
20   seal --
21          THE COURT:  And I don't anticipate --
22          MS. MCINTRYE:  So it might make sense.
23          THE COURT:  -- pointing to specific unique aspects of
24   the individual proposal, nor do I expect to go into any details
25   of a personal matter that had been protected.  I guess this is

1  more just caution to the parties, if they would like to have

2  those discussions, I believe -- at least my preference would

3  be -- that we do that under seal.

4      So perhaps to the extent that any of the parties get

5  to a point where they want to have that discussion, I will

6  provide some time at the end if we need to go under seal and

7  have that conversation. Does that work?

8      MS. MCINTRYE: Understood.

9      THE COURT: All right. Very well. Anything we need

10  to take up before we move into the Court's questions?

11      MR. WILLIAMS: Not for plaintiff.

12      THE COURT: All right. Let's start with, I know it's

13  an easy one but probably the most prudent. And that relates to

14  the standard of review that the Court applies here. I mean --

15  and I'll start with Forest Service on this question. Does the

16  default deferential standard under the APA apply for this Court

17  for this matter?

18      MS. MCINTRYE: Yes. This is an APA challenge and the

19  arbitrary and capricious standard review is the one that's

20  applicable. So the question would be, the ultimate question of

21  whether the decision was reasonable. Satisfactory explanation

22  and consideration of all the relevant facts being some of the

23  hallmarks of that doctrine.

24      We also have a case here that does involve technical

25  expertise, and case law speaks to that there is greater

1  deference provided in those types of scenarios.  Certainly we
2  have helicopters, skiing in the back country, in the winter,
3  remote locations, intense physical activity, and certainly
4  technical expertise applied by the Forest Service in
5  determining how to issue these special use permits for safe
6  recreational use on Forest Service lands.
7      THE COURT:  And in that vein, before I turn to
8  Mr. Williams or hear his thoughts on this.  What type of law is
9  the Court shackled to here?  I think there's reference in the
10 briefings to sort of I guess procurement case law.  But would I
11 be right to assume that what I'm constrained to or limited to
12 is simply Ninth Circuit case law, and I guess not in any way
13 influenced by any procurement case law that follow this matter
14 before it came to my court?
15     MS. MCINTRYE:  That's correct, Your Honor.  We're in
16 APA challenged landscape, where the standard of review is
17 arbitrary and capricious in terms of the decision as a whole.
18 And the final decision that's at issue here is Supervisor
19 Schramm's final decision.  Plaintiff does want to move this
20 into more of a procurement solicitation-type place.  Where we
21 are looking more at the panel of review rankings.  However that
22 is only a non-binding recommendation part of the process at the
23 beginning.  We're looking at the final wholistic decision by
24 Supervisor Schramm looking over the applications, and plaintiff
25 frames it as breaking down some of these criteria.  And as is

1  due and correct, Supervisor Schramm addressed those concerns as

2  well, considering of all the facts and coming to a reasonable

3  decision.

4         But we are in just straightforward agency action,

5  arbitrary and capricious review standard.  Procurement

6  solicitation has its own doctrine.  It has its own case law

7  doctrine about the nuances, and it's looking at procuring some

8  kind of tactile thing usually, an object for use by the

9  government or a runway.  Here we have permitting and

10 operational plan on Forest Service lands, in a manner that best

11 provides for safety, enjoyment, and minimizes impacts to that

12 landscape.

13        THE COURT:  Thank you, Ms. McIntyre.

14        Mr. Williams, your thoughts.

15        MR. WILLIAMS:  Yes.  We agree with what the Department

16 of Justice said that the arbitrary and capricious standard of

17 the APA, 5 U.S.C. 706(2)(a) applies to this Court's review of

18 this final agency action.

19        I disagree with the statement that the procurement

20 case law does not apply, and here's why.  That case law

21 applies, and we cited a bunch of federal court of claims

22 decisions, because the federal court of claims federal judges

23 apply the arbitrary and capricious APA standard to the

24 procurement cases before them.  They are directed by a statute,

25 28 U.S.C. 1491(b)(4), to apply the APA standard of review.

 1   They're applying the exact same arbitrary and capricious

 2   standard of review that this Court applies to final agency

 3   action that it reviews.  There is no distinction between

 4   federal judges in the court of claims reviewing agency

 5   decisions about procurements and contracting and what have you

 6   and in this case.  And nor are those cases limited to things

 7   like tangible objects or runways.  Those cases apply to things

 8   like plans and services and all sorts of things.

 9          We cited a number of cases that we would urge this

10   Court to review, including the *360Training.com* case from the

11   federal court of claims.  That's about services.  That's 106

12   Fed. Cl. 177.  The *AshBritt* case -- all these are in our

13   briefs -- but 870 -- excuse me, 87 Fed. Cl. 344, and the *Hunt*

14   *Building* case, and that's at 61 Fed Cl. 243.

15          The reason I bring up those cases, Your Honor, is

16   because they do say that an agency, in making decisions about

17   how it's going to obtain something or make a decision, has a

18   lot of discretion, a lot of technical discretion about how

19   exactly it's going to make its decision.  How exactly it's

20   going to inform applicants of the standards the agency is going

21   to use.  The criteria.  There's lots of technical discretion

22   the Forest Service exercised here in coming up with the 16

23   prospectus criteria, that were in the prospectus that is the

24   basis of final agent action here.  Lots of technical

25   discretion.

1    However when the agency identifies in writing how it's

2 going to make a decision about permitting, it doesn't have the

3 discretion to depart from those criteria in the manner that the

4 Forest Service did here.  It is duty bound.  It's hornbook law,

5 a lot of case law says, like the *Hunt* case.  It's hornbook law

6 that once the agency exercises its discretion and commits

7 itself to written criteria, that those criteria are binding.

8 It can't depart from them.  It can't relax them for an

9 applicant, as the Forest Service did here with Pulseline, nor

10 can it decide not to following the plain text of the criteria.

11    We're not dealing with an agency interpretation of a

12 statute or a regulation that's ambiguous.  We're not in

13 "deference to agency interpretations of words on paper" land.

14 We're in "plain language of the criteria" land.  And here the

15 Forest Service rejected the plain language of the criteria,

16 which is why I disagree with Ms. McIntyre's assertion that that

17 case law doesn't apply.  It is on all square corners with this.

18 It's APA standard of review of government decision making under

19 written criteria.

20    THE COURT:  Thank you, Mr. Williams.

21    Let's move on now.  So I guess under the umbrella of

22 arbitrary and capricious, and again, I'll start with you,

23 Ms. McIntyre, to what extent can the Forest Service look, I

24 guess, beyond the applicants' applications to evaluate them.

25    We look at these pieces of paper, and there's a lot of

```
 1    dispute as to -- well, let's use, for example, because this is
 2    at the heart of the dispute.  This idea that you're not
 3    evaluating the company, you're also evaluating the employees of
 4    that company.  There seems to be a distinction here, a point of
 5    contention, whether or not the Forest Service was allowed to
 6    look beyond the company itself and at the employees who, I
 7    guess populate that company.
 8            But I guess back to that threshold question.  To what
 9    extent can the Forest Service look beyond the applicant's
10    application to evaluate them?
11            MS. MCINTRYE:  Well, I would answer that with, in this
12    case the Forest Service did look at the application.  This
13    material that was included in the application is probably the
14    most notable point here laid out in detail by Pulseline in
15    terms of each member's experience, both heli-skiing and then
16    also on the Cordova Range.  And as the Forest Service noted,
17    and as was important to it in its decision making, they did
18    have extensive experience in that regard.
19            So they did look at the applications in terms of
20    discerning that information.  Not sort of outside their written
21    documentation.  But to take that a step further in terms of how
22    this decision was arrived at, you know, we have an application
23    process here that is on paper as you seem to note.  And there
24    is sort of a natural imperative for applicants to put forward
25    the best package that they can.  You know, sort of put forward
```

1   what you have, because you're trying to obtain this desirable

2   permit and show the best information and best qualifications

3   that you have for that.  So there's sort of a natural

4   imperative there to do so.

5        So Pulseline, a startup type company, put forward the

6   experience of its members.  In terms of how it responded to the

7   prospectus, its broad goal, and then the criteria that the

8   Forest Service laid out as well.

9        And then in terms of on appeal in the final decision

10  at issue here, plaintiff raises this question of what did the

11  Forest Service look at?  Well, the Forest Service looked at

12  both applications on the same footing.  It looked at experience

13  of the company and of its members for both of these applicants.

14  And Pulseline simply took the step to put that information into

15  its application.  And Silverton simply put forward a slimmer

16  application in many regards.

17       Notable here though, besides the application itself,

18  Silverton also had the opportunity to appeal.  And it wasn't

19  shy about putting in extra information on appeal as well.  It

20  certainly put in information in regards to Mr. Brill's personal

21  criminal history.  And likewise could have and did put forward

22  other information about its own qualifications.  So there is

23  ample opportunity to do so in the process.  It's inherent to

24  the nature of the thing to put forward the best application

25  possible.

1          You know, and we can see in the proposals themselves

2   that Pulseline put forward a 147-page proposal and Silverton

3   put forward a 55-page proposal.  So to a degree here we have an

4   applicant who put forward an adequate proposal as the Forest

5   Service found, but simply not thorough and detailed enough and

6   they're disappointed with that result.

7          THE COURT:  How much liberty does the Forest Service

8   have to, I guess, sort of absorb experience in a more practical

9   manner, you know, if Mr. Brill's company had a longstanding

10  history of working with the Forest Service and complying with

11  permits, things of that nature.  Wouldn't it probably be

12  intuitive that their application itself might be slimmer,

13  because they would assume that the Forest Service had some

14  historical knowledge as to their performances and, well, any

15  number of criteria.  Would it be improper for someone to have

16  assumed that?

17         MS. McINTRYE:  Yes.  The prospectus itself speaks to

18  that the review will be of prospectus applications.  So again,

19  speaking to that imperative, to put forward what you have in

20  the written application process.  Whether that be documents or

21  otherwise.  And Silverton did put forward some of this

22  information and notably it received more points from the panel

23  rankings.  And I want to sort of not focus there, because

24  again, the arbitrary and capricious standard of review is on

25  the final decision.  But to the degree that plaintiff has

1  framed it as such, plaintiffs did receive more points there.

2      Now it is arguing a fairly extreme position in one

3  alternative that Pulseline would be awarded none of these

4  points, because it is a startup company and doesn't have this

5  experience.  But the prospectus did not require that applicants

6  be established companies, and it makes sense based on the goal

7  of the prospectus that the goal was to encourage applicants to

8  put forward the best proposal that they could.  In terms of how

9  they would operate, in terms of their experience, in terms of

10 the other criteria that are set forth in the prospectus.

11      THE COURT:  So before I turn to Mr. Williams, one last

12 question sort of on this thread.  If you look at the

13 prospectus, there are times where Forest Service references

14 company without sort of a following parenthetical.  And then

15 sometimes they reference company and the employees therein.  Is

16 there any weight that this Court should give or any distinction

17 between when the Forest Service in its prospective references

18 company versus when they reference company and employees?

19      MS. MCINTRYE:  The final decision that is on review

20 here for this Court is Supervisor Schramm's final decision.

21 And the arbitrary and capricious standard applies.  So

22 Supervisor Schramm walked through in detail an explanation of

23 how his final review approached looking at these applications

24 and looking at that question of how his company applied.  And

25 that is a very reasonable approach.  It's detailed and thorough

1  of his explanation on doing so.  It also makes common and

2  logical sense.  What was put forward in the applications was

3  what the Forest Service had to base its decision on.  And his

4  decision takes a deep dive.  So under the arbitrary and

5  capricious review standard that decision was reasonable and

6  should be upheld.

7          THE COURT:  Thank you, Ms. McIntyre.

8          So, Mr. Williams, on that point, wouldn't it be

9  somewhat nonsensical to reduce an application or the experience

10  aspect of an applicant to the company name itself without

11  considering the people who actually populate that company,

12  because it's an individual experience it seems that would have

13  substance.  Or I guess to look at it another way, you know, if

14  I were to buy a company and rename it.  So new owner, new

15  company title, all the employees remain the same.  Wouldn't

16  they still have the same experience level had I never bought

17  the company?  Does that make sense?

18          MR. WILLIAMS:  Your question makes sense.  These

19  questions are answered by the criteria themselves.  Silverton

20  did not write the criteria, the Forest Service did.  The Forest

21  Service could have gone about this differently if it had

22  written different criteria.  The three company history

23  performance related criteria that we focused on in our

24  briefing, Your Honor, the permit compliance history, the

25  working relationship with regulatory agencies and the

performance evaluations.  The word company shows up five times
in those three criteria, but there's more.

Those criteria seek records and evidence.  The words
records and evidence of company performance, past performance
show up repeatedly in those criteria.  Not the rest.  But those
it's very clear that it's backwards looking.  Again, the Forest
Service wrote those criteria.  It is duty bound to apply them.

But let's just set that aside for a moment, the plain
language of the criteria.  And by the way, there's a case, Your
Honor, it's the *CliniComp* case, does state that courts should
review criteria like this in accord with their plain language,
particularly when they are unambiguous like this.

So let's just consider the experience of an
applicant's employees and guides, for example.  The Forest
Service has embraced the experience of Pulseline's employees
and guides as satisfying these criteria.  These particular
three that I keep mentioning, the company performance history
criteria.  Now again, those criteria seek records and evidence
of the past.  There is nothing in the record about the records
and proof that the former operators that Pulseline's guides and
employees were apparently associated with met those criteria.
There's nothing in the record about H2O Guides.  For example,
who the Forest Service says, oh, that satisfies the criteria,
let's give Pulseline 4 out of 5 points for permit compliance,
because they used to work for H2O Guides.  Well, where's the

1  records and proof that H2O Guides complied with their permits?

2  It's not in the record.

3        The only thing in the record about H2O Guides, by the

4  way, if I can just address this small point, is in the record

5  at page AR 1917.  AR 1917.  And that says that there are

6  serious issues, quote, "serious issues with H2O Guides."  That

7  thing also says that the two individuals associated with

8  Pulseline are somewhat familiar to that one Forest Service

9  permit administrator who wrote in response to this question.

10       Now compared to Silverton Mountain Guides there were

11  four references attached to its application from federal permit

12  administrators.  All positive.  On their own the Forest Service

13  went out and inquired about Silverton, and five additional

14  federal and state permit administrators wrote back with

15  overwhelmingly positive comments about Silverton, like model

16  operator.  There's is nothing like that about Pulseline.

17  There's nothing like that about the former operators that its

18  guides apparently were associated with.

19       That shows that this issue of can you look behind the

20  company at the people -- okay -- let's assume that you can.  I

21  think that's wrong, because of the way the criteria were

22  written.  But even if you go behind the company and look at the

23  people, there's no records about permit compliance and working

24  relationships with regulatory agencies for the other company

25  that apparently the guides were associated with in the past.

1    I'd like to address a couple of additional things that

2   Ms. McIntyre mentioned, if I could?

3          THE COURT:  You may.

4          MR. WILLIAMS:  She pointed out that on these company

5   permit compliance and performance criteria the Forest Service

6   gave Silverton 12 out of 13 points and it gave Pulseline 10 out

7   of 13.  As if that means no harm no foul.  Well, Silverton put

8   in front of the panel records and proof requested by the

9   agency, and it received 12 out of 13 points.  There's no

10  records and proof about Pulseline whatsoever.

11         Everything in that 147-page application is

12  aspirational, because it doesn't -- it's not the product of

13  years of experience actually performing.  It's written well,

14  but it's aspirational.  It's forward looking.  It's not resting

15  on a bedrock of actual experience.

16         THE COURT:  Well, wait a minute, Mr. Williams.  Isn't

17  the whole point here to be forward looking, to award a permit

18  moving forward and -- you know, I can appreciate the

19  distinction between having the records of past performance, but

20  if, you know, one applicant just says we'll have a safety plan

21  and the other applicant has a 40-page safety plan.  I mean that

22  should mean something.  It has some value to say this is how we

23  will approach these issues as we moving forward.  And absent

24  that articulation, what would the Forest Service really have to

25  base future performance on?

1          I mean it just seems difficult if not impossible if

2     the Court were to follow your line of thought here, then any

3     new operator need not apply.  That the Forest Service would

4     have intentionally created an evaluation model that would make

5     any new player in this arena untenable.

6          MR. WILLIAMS:  Thank you for raising that.  The

7     Department of Justice made that point in its brief and the

8     answer to that is the criteria.  Three of the criteria are

9     explicitly retrospective not prospective.  Three of the

10    criteria are looking at past performance.  Not all the

11    criteria.  Perhaps the safety plan is prospective.

12         But the company performance history criteria 01,

13    permit compliance, records from previous permitting agencies

14    indicates the company understands permit requirements and

15    adheres to stipulations.  Absence of convictions.  We have

16    convictions here by the way.  Absence of convictions that

17    indicate poor business practices.  Working relationship with

18    regulatory agencies.  Provides evidence of company initiated

19    meetings.  Something Pulseline said in its application itself,

20    it could not meet because it didn't have any history there.

21    Performance history.

22         Performance history.  So three of the criteria here

23    worth a total of 13 points are explicitly expressly looking at

24    the past.  And those are the criteria that the Forest Service

25    chose to relax for Pulseline, because, as is apparent, it liked

other things about Pulseline better.  Perhaps its safety plan
it liked better, but it doesn't have the discretion to
disregard those written criteria.

THE COURT:  So ultimately the plaintiff contention
here is that for these I think four criteria specifically
Pulseline should have gotten zero points?

MR. WILLIAMS:  If they were applied as written, it
should not have received ten points.  I don't know what the
number is.  Perhaps it's zero.  Perhaps it's one or two.  But
those criteria sought records and evidence and Silverton put
that in front of the Forest Service.  Pulseline did not.  The
Forest Service gave Pulseline 10 out of 13 points for records
that don't exist.  It's as simple as that.

THE COURT:  But do you see my issue here though,
because based on how you presented it, it does feel somewhat
like a binary construct.  If you're a new company for these
four criteria you would only be able to get zero points.

MR. WILLIAMS:  Write different criteria.  If the
Forest Service wants to give a startup a chance, write
different criteria.  So there is no requirement that an
applicant have a permit history.  There's no requirement that
it have held a permit in the past.  That's true.  There's no
requirement there.  But the criteria made it, the specific
criteria on which 13 points turn out of 60.  We didn't write
the criteria, the Forest Service did.

```
 1          THE COURT:  You didn't write the criteria, but you are
 2   reading them in such a structured literal way, it does seem
 3   hard -- it seems counterintuitive to what the ultimate purpose
 4   here of I guess the Forest Service was.  And again, just by way
 5   of analogy, had Pulseline hired all of Silverton's employees
 6   and then put in their permit, would the argument still be that
 7   the Forest Service couldn't look at the employees and their
 8   history of permit compliance, even if there were no records
 9   from Pulseline themselves, why would that not be a natural
10   organic way in which Forest Service could evaluate a new
11   entity, I guess from a corporate standpoint, who is entering
12   this market?
13          MR. WILLIAMS:  The Forest Service has the discretion
14   to write the criteria.  I agree with the Department of Justice
15   and the Forest Service that they have tremendous technical
16   discretion in judgment about how they want to go about
17   selecting applicants.  And they exercise that discretion in
18   writing the criteria.  They write the criteria.  And we as
19   citizens are entitled to expect that our government agencies
20   follow the rules they put on themselves.  That they follow
21   their own North Star.  Here the North Star is the criteria.
22   They said it's to select the best qualified, but they said
23   we're going to get to best qualified through the criteria.
24          So it may seem like an absolutist's position, but it's
25   what the criteria say.  And the case law on criteria is apply
```

 1    then in accord with their plain meaning.

 2           THE COURT:  And I agree with that, and I do think it's

 3    sort of an absolutist-type interpretation here.  And I don't

 4    know that when I issue a written order that I expect people to

 5    see it as malleable as that.  I mean, it's just sort of the

 6    nature we do here.

 7           But I guess in the vein, to look at it from a

 8    different direction.  On the one hand it would seem that

 9    Silverton's arguments are you can't look at these employees.

10    You can't sort of pierce the company and find this context.

11    But on the other hand, Silverton makes fairly stringent

12    arguments that the Forest Service failed to evaluate the owner

13    of Pulseline and all the minutia of his past.  So how can you

14    have it both ways?

15           I recognize there's a reference to conviction, but it

16    seems to me here Silverton's position is Forest Service failed

17    to really look beyond this and really get a sense of who this

18    owner was.  But on the other hand, Silverton saying don't look

19    at the employees and get a sense of who they are and what they

20    might bring to the table.  And for me, and maybe I'm wrong, but

21    it's hard to reconcile those two arguments.

22           MR. WILLIAMS:  Well, thank you for asking that.

23           The issue is the Forest Service wrote criteria that

24    rewards experience, that rewards records and proof of actual

25    experience.  That's the criteria.  So then when Silverton

1  received the decision in which it ranked a startup without a

2  history above Silverton, we looked at it.  And the Forest

3  Service in response to the administrative appeal talked about

4  the employees of Pulseline.  In response to that, our answer is

5  okay, if we're going to look at the employees, let's look at

6  the employees.

7          Part of disparate treatment here is the Forest Service

8  has adopted a remarkably different way of looking at this

9  stuff.  With Pulseline it assumes the best despite the record

10 proof to the contrary.  And with regard to Silverton, it

11 assumes the worst, despite the positive facts to the contrary.

12         So if the record -- if the Forest Service is going to

13 rely on the experience of the employees and the owner of

14 Pulseline, it can't pick and choose which facts it considers.

15 It can't put blinders on.  It has to look at the totality.

16         THE COURT:  But it also, it may have to look at the

17 totality, but it also gets to evaluate and weigh these

18 different facts and to a way -- I mean, there's got to be some

19 deference here that I give to the Forest Service, right?

20         MR. WILLIAMS:  The deference is its decision to write

21 the criteria, to crystalize what it wants in applicants, in a

22 successful applicant.  The Forest Service told the applicants

23 we're going to pick the successful ones among you based on

24 these criteria.

25         Now certainly when a federal court reviews agency

1  action it approaches it from of a spirit of deference and kind

2  of assuming that the agency probably got it right, but that has

3  limits.  The Hard-Look Doctrine under 5 U.S.C. 706 really

4  requires the Court to take a hard look and if the rationale

5  doesn't add up it's not required to defer to that.

6       The case law we've cited in our briefs says that it's

7  quintessentially arbitrary and capricious and irrational and

8  unreasonable to excuse one applicant from some of the criteria,

9  because the agency may just like it better or prefer it, or

10  think it does better on some other criteria.

11       The deference has limits.  And it ends when the agency

12  has departed from the plain text of its criteria and come up

13  with rationale frankly that confirm that it departed from the

14  plain text, as it did here.

15       THE COURT:  Thank you, Mr. Williams.

16       And, Ms. McIntyre, I mean part of the problem, and

17  when we talk about deference to agency action -- I don't even

18  think I could stand up on skis without falling over.  So I

19  don't know that I really want to be in the business of deciding

20  what is or is not good as far as permitting an Alpine --

21  anyway, nevertheless.

22       But I couldn't help as I looked through the materials

23  to see, I guess, some sense here that if I was skeptical or if

24  I was perhaps paranoid, I could see the way in which these

25  criteria were applied.  It seemed to be more forgiving to

1    Pulseline than it was to Silverton.  Now if I just have an

2    inkling of that, does it matter at all as far as what this

3    Court's obligation is?

4        MS. MCINTRYE:  No.  The standard again here is highly

5    deferential to the Forest Service.  It's the arbitrary and

6    capricious standard.  The procurement landscape that plaintiff

7    counsel wants to argue for is a separate doctrine.  I don't

8    know of any cases that apply the procurement standard in this

9    type of Forest Service permitting context or other public lands

10   context.

11       So arbitrary and capricious is our guiding star here.

12   And in terms of that standard, you know, the Court doesn't

13   substitute its judgment for that of the agency.  And the APA

14   does not allow the Court to overturn agency decisions just

15   because it disagrees with them.  Supervisor Schramm's decision

16   was thorough and detailed.  And our lodestar here is it was

17   reasonable.  It took and analyzed plaintiff's arguments, and to

18   that end, looked at these arguments in light of its review of

19   these applications as a whole.

20       And I want to be careful not to, you know, let

21   plaintiff paint the picture too much here without responding in

22   terms of the records and evidence.  You know, it's not entirely

23   true that there is no evidence that H2O Guides was a successful

24   company in terms of the Forest Service review of this

25   candidate.  The guides worked with the prior permit holder, H2O

1   Guides, for many years, including its operations manager who

2   worked with them for fours years, and you can see that in the

3   agency record at pages 32.  58 through 59, they talk about

4   complying with all permit stipulations, fee payments and record

5   keeping and reporting.  They provide a reference from someone

6   at the natural -- Division of Parks and Outdoor Recreation.

7   And there is a reference from the Cordova Ranger District that

8   speaks to that they know the terrain well.  That they have

9   experience skiing there, and that that's important.  And

10  plaintiff wants to sort of push that aside.

11          And again, due consideration was given to the fact

12  that plaintiff does have more permitting experience in this

13  arena.  And that's how the decision reads and that decision is

14  reasonable.

15          So to answer your question directly, to the degree

16  that the final decision reviews these applications and takes a

17  detailed look at the position that plaintiff's put forward, the

18  decision is reasonable, and that's the standard of review that

19  the Court should apply.

20          THE COURT:  Let me ask you a more pointed question and

21  I recognize there's a spectrum here where it's more difficult

22  to analyze decision points from the perspective of arbitrary

23  and capricious than others, but it appears Forest Service did

24  deem Silverton's application as adequate.  So how can this

25  Court not see stopping at three and not including Silverton at

1    four as anything other than arbitrary?

2         MS. MCINTRYE:  Well, that's the discretion element.

3    That's the discretion that the Forest Service has to select the

4    best qualified applicants.  And it has the discretion to select

5    one applicant, three, four.  And in this case, it selected

6    three.

7         Plaintiff importantly, I think for this case and the

8    arguments that are put before the Court, challenges Pulseline

9    specifically.  It doesn't challenge the other two applicants.

10   It doesn't argue that it should be included as fourth, although

11   maybe they would try.  But the key point here is that the

12   process places the discretion with the Forest Service.  The

13   Forest Service regulations give it that discretion and that

14   makes common sense here.  That this is an area of technical

15   expertise, not only in terms of that ultimate final decision,

16   in terms of reviewing the applications, but also how many

17   applications to grant.  And here the Forest Service selected

18   three.  We don't have that issue raised on appeal below in

19   terms of, you know, should they have added a fourth.  The

20   question that we have here is should plaintiff basically be

21   slipped in to where Pulseline sits or somehow bumped out of the

22   ranking.

23        THE COURT:  And I agree that that's essentially the

24   argument, and I do think it's fairly obvious why I think

25   Silverton believes Pulseline, or why Pulseline is the target of

1   Silverton's I guess legal ire here, and it is distinction

2   between experience.

3         But I guess, while I agree that the Court has to draw

4   a deference to the discretion of the agency, that discretion

5   always must be wed to -- there has to be a fidelity of process,

6   correct?  And if there's nothing articulated as to where this

7   line of demarcation is between who moved forward who didn't,

8   and it clearly is inadequacy, because the Forest Service had

9   said Silverton's application was adequate.  Doesn't it at least

10  seem like a symptom of arbitrary and capricious if the line was

11  drawn between three and four, and from the Court's perspective

12  both three and four were adequate -- and two and three were

13  adequate?

14        MS. MCINTRYE:  Adequate, but not thorough and detailed

15  enough.  Not thorough and detailed enough to be selected for

16  further processing.  Not thorough and detailed enough like

17  Pulseline's application, which details a thorough safety plan,

18  provides diagrams and forms and a full employee training manual

19  that lays out the experience of the individuals who are going

20  to be running the company on a regular basis.

21        So to answer your question, deference is due to the

22  discretion to select these applicants even though some of them

23  may be adequate but just not thorough and detailed enough to be

24  best qualified to meet the goals of the prospectus.  And I

25  think we focus on the goal of the prospectus.  It's safety,

1    meeting those recreational needs, and minimizing impacts.  And

2    as Supervisor Schramm's decision walks through, Pulseline's

3    proposal handily meets that, in terms of its details, in terms

4    of its explanation of the leave-no-trace policies, in terms of

5    having an employee handout on that front.  And Silverton simply

6    did not in its discretion provide as much information and -- to

7    meet that goal.  So it selected those three applicants,

8    including Pulseline, as the best qualified.  And given the

9    substantial explanation and considering of all the facts, that

10    decision was reasonable and not arbitrary and capricious.

11         MR. GARDEN:  Your Honor, this is Kevin Garden.  Can I

12    just add one brief point?

13         THE COURT:  Please do.

14         MR. GARDEN:  Okay.  I just want to point out there

15    were actually seven offers, all of which got pretty healthy

16    scores.  So the government's counsel, the points they're

17    making, is that they have to draw the line somewhere.  So if

18    you don't draw the line between three and four, what if they

19    don't draw the line after number seven.  I think the government

20    clearly had to make a decision as to where to make that cut,

21    given that they had seven applicants.  All of which got, you

22    know, the first applicant right behind Silverton was

23    1.25 points behind them.  So the line had to be drawn

24    somewhere.

25         THE COURT:  No, and I appreciate that.  Eventually,

1   you know, obviously the Forest Service had to make a selection.

2   Again, to the extent that it was articulated as part of the

3   process that there would be this line of demarcation, other

4   than simply selecting the applicant who finished first in

5   scoring, is in and of itself I guess, absent explanation,

6   arbitrary.  Although I do appreciate the distinction between

7   adequate and best qualified.  But wherever you draw that line

8   without defining where that line is could at least be

9   interpreted as arbitrary.

10          With that being said, I think I appreciate the

11  parties' perspectives on that.  I'm going to stay with you,

12  Ms. McIntyre, let's say that I find Silverton's arguments

13  persuasive, what is the remedy here?

14          MS. MCINTRYE:  For sake of presentation, if you find

15  their arguments persuasive, remedy could look like many

16  different things based on the findings, but it would be a

17  challenging remedy to apply.  The permits have already been

18  issued to these companies and this is a wholistic type of

19  analysis.  To the degree that there is another reading of the

20  prospectus presented or that it should be applied in a

21  different way, then it really should have been applied to all

22  the applicants in that way, arguably.

23          You know, take for instance the criminal background.

24  No one else has had their criminal background delved into other

25  than Mr. Monroe.  To put the applicants on equal footing, you

1   know, it would arguably be necessary to open this up and

2   complete a review for all owners in that fashion.  Which is,

3   you know, which is burdensome and potentially unjust in other

4   ways considering the way that the criminal system is meted out

5   amongst the 50 different states.

6           But be that as it may, the larger point is that there

7   would have to be basically be an undoing of the whole process,

8   because plaintiff is taking issue with the first part of this

9   process, the non-binding recommendation part of this process,

10  before it even goes to the district ranger, who has complete

11  discretion to review the applications, look at the panel

12  rankings.  Now here he did select them based on those sort of

13  one, two, three.  But then the issue that we're reviewing here

14  is that financial decision by Supervisor Schramm.  So to some

15  degree that makes any remedy a really tough fit.  Because

16  plaintiff is proposing that we address this process at the

17  beginning rather than at the end.

18          THE COURT:  So safe to say that Forest Service's

19  position is I can't as a court just reevaluate these two, for

20  these categories?  It has to go back and, I guess

21  theoretically, you would start from scratch with all applicants

22  and I guess reassess?

23          MS. MCINTRYE:  Correct, Your Honor.  Any kind of new

24  reading of the prospectus criteria would require such result.

25          THE COURT:  And do you agree with that, Mr. Williams?

1      MR. WILLIAMS:  No, Your Honor.  First, I want to

2    respond to a couple of the things.

3      THE COURT:  Sure.

4      MR. WILLIAMS:  One is that Ms. McIntyre suggested that

5    Silverton is only asking the Court to review the beginning of

6    the process.  I don't quite understand that.  We're asking the

7    Court review final agency action.  Final agency action is

8    Mr. Schramm's decision.

9      We think given the degree to which Forest Supervisor

10   Schramm chose to excuse Pulseline from the written criteria he

11   said he was applying, requires that if the Court agrees with

12   Silverton, and we certainly hope that the Court does, that it

13   vacate the decision.  It vacate the decision that's in front of

14   the Court and remand to the agency.

15      I'd like to mention a couple of additional things.

16   Ms. McIntyre keeps referring to the case law from the federal

17   court of claims as a procurement standard.  What is the

18   procurement standard?  Oh, 28 U.S.C. 1491(b)4 says what that is

19   standard is.  It's 5 U.S.C. 706, the exact same statute that

20   applies here.  So the standard is the same.  I just want to

21   emphasize that.  And that case law says that if an agency

22   relaxes prospectus criteria for one applicant, that's arbitrary

23   and capricious.  The *CliniComp* case is an excellent case on

24   that point as is the *Hunt* case, *Hunt v. United States*.

25      THE COURT:  If I go back, and I appreciate the

1  distinction, if I go back just to ensure that I understand it.
2  I was under the impression that in your complaint you were
3  essentially asking this Court not only to remand but to remand
4  and direct the Forest Service to I guess process Silverton
5  ahead of Pulseline.  Is that -- am I misunderstanding what was
6  in the original complaint?

7          MR. WILLIAMS:  We did say that in the complaint.  We
8  also asked the Court to vacate and set aside the final agency
9  action.  In candor, I think the appropriate remedy, if the
10 Court agrees with the plaintiff, is to vacate the final agency
11 action before it and remand.

12         THE COURT:  Okay.  I guess it begs the question, if
13 the request was for me to essentially switch Pulseline and
14 Silverton, I'm not aware of any authority that would allow me
15 to do that.

16         MR. WILLIAMS:  I don't disagree with you, Your Honor.

17         THE COURT:  Okay.

18         MR. WILLIAMS:  I will note in a hypothetical world
19 where there were four permit holders, Silverton would be
20 privileged and pleased to operate as a permit holder based on
21 its 15 years of perfect permit compliance history and perfect
22 safety history.

23         THE COURT:  All right.  Let me see if there's anything
24 I have left.

25         And while I'm looking at my notes, I know, Mr. Garden,

1  we haven't had much opportunity to hear from you.  I think

2  partly that's just logistics or the medium in which you are

3  participating.  But based on conversation we've had so far, are

4  there any additions points you would like to make or any points

5  you would like to stress?

6       MR. GARDEN:  Yes, Your Honor.  There's one in

7  particular.  I'm going back to the issue of the company versus

8  employees in that language in the prospectus.  What I wanted to

9  point out is that, first of all, with regard to the prospectus,

10  a question you asked earlier.  If government counsel pointed

11  out that the prospectus clearly says, if you want them to

12  consider it put it in your proposal, is the arena of the four

13  corners, except to the extent that the prospectus allows the

14  Forest Service to look elsewhere.

15       With regard specifically to the company versus

16  employee issue.  The point I would like to --

17       THE COURT:  I'm sorry, Mr. Garden, if I could

18  interrupt you briefly.  We have Madam Court Reporter here who

19  is trying to take everything down.  It's a little bit harder

20  over the phone, and I apologize for interrupting, but if I can

21  ask you to speak a little more slowly.

22       MR. GARDEN:  No problem, I apologize.  Your Honor.

23       So with regard to the company versus employee issue

24  that we were talking about earlier, I believe it's pretty clear

25  that the issue comes down to what is the logical and reasonable

1　interpretation of the prospectus term with regard to that

2　issue.  And a very important point I want to make to the Court

3　is that, if you look at Silverton's proposal, they repeatedly

4　refer to experience of Mr. Brill and others prior to when

5　Silverton was set up, even when it was set up in Colorado,

6　going all the way back to 1999.  They repeatedly talked about

7　Silverton's experience and they had people comment on that and

8　give them recommendations based on that experience of the

9　people before Silverton even existed.

10　　　　　So my point, Your Honor, would be that it's very clear

11　from Silverton's proposal, and I've got AR pages 3315, 3316,

12　and 3321, that Silverton clearly understood that when the

13　prospectus referred to experience and company experience, it

14　meant experience of the people that worked for the company.

15　And while their lawyer is making a different argument today, I

16　think that really shows you that all of the parties before

17　dispute arose clearly recognized that that was a reasonable and

18　appropriate interpretation of that particular term in the

19　prospectus.

20　　　　　THE COURT:  Thank you.

21　　　　　MR. GARDEN:  And one other point, Your Honor made a

22　good point, I wanted to add to it.  With regard to the logic of

23　Silverton's position.  To take your example, but to kind of

24　change it a little bit.  If a company were to sell itself to

25　another person, but the company entity were to stay the same,

1  but the new owner were to fire everybody that worked for that
2  company and hire a completely new staff that didn't know
3  anything about heli-skiing, under Silverton's argument that
4  entity could claim all of that prior experience of the company
5  as credit in the proposed evaluation, even though none of those
6  people were there anymore.  That doesn't make any logical
7  sense.

8          MR. WILLIAMS:  May I address that briefly?

9          THE COURT:  One second.  Thank you, Mr. Garden.

10         I think that concludes I think my broader questions,
11 and I know you're going to have a moment here, Mr. Williams, to
12 express anything in addition you would like to express.  So I'm
13 going to turn it over to the parties.  You have about five
14 minutes each.  If there's anything you think I missed or any
15 questions that I posed that you think are evidence of my
16 ignorance.  But again, I think I do struggle, and to the extent
17 that this helps inform the way you use your time, is that I
18 don't find -- I don't find it logical.  I don't find it
19 compelling that this idea that any new company applicant should
20 receive zeros when it relates to experience under the four
21 criteria, referenced I think several times by Mr. Williams.

22         But on the flip side, it does seem to me odd, and I
23 use a nonlegal term, because I don't want to say it's per se
24 arbitrary.  But it does seem odd when I look at the scores, and
25 I'm not going to put those into the record because I believe

1   those are protected, that there's not a lot of daylight between

2   the two applicants, again I'm referring to Silverton and

3   Pulseline here, that would seem to, I guess, under weigh or

4   undervalue Silverton's experience specifically as it related to

5   this endeavor.

6        But with that being said, I'll start with you,

7   Mr. Williams. Anything that you would like reinforce and

8   anything that we haven't discussed that you would like to

9   discuss?

10        MR. WILLIAMS: Yes, Your Honor. Thank you. A few

11   things. The suggestion that Pulseline's application was

12   inadequate or poor is simply not belied by the record. I said

13   Pulseline -- excuse me, I meant Silverton. Thank you to my

14   client for correcting me -- the suggestion that Silverton's

15   application was inadequate is just simply wrong.

16        The record shows that of the four panelists who each

17   awarded an individual point, the second highest point awarded

18   was 57 points out of 60. That was to Silverton on page 1950 of

19   the record. So if one panelist thought it was so good it would

20   award 57 out of 60 points, the second highest score, that says

21   something.

22        In addition, I didn't quite follow it, but I believe

23   that Kevin Garden was suggesting on the telephone here just

24   now, that somehow Silverton has not been in existence for as

25   long as it claims to have been in existence. It has been

1   continuously in existence since I believe it's 2008 or 2009 and
2   the records in -- the documents in the records show that.  So
3   the perfect permit compliance history, perfect safety record
4   over 15 years is in the record.

5       There isn't that much distance between Pulseline and
6   Silverton here.  It was 3.75 points.  And the three criteria we
7   focused on were worth a total of 13.  So it may seem a little
8   formalistic, but that's how the process worked that the Forest
9   Service set up.  And Forest Supervisor Schramm upheld those
10  award of points in the final decision.  That is the final
11  agency action here.

12      Finally I want to go back to this point about the
13  employees.  And Mr. Garden identified a hypothetical of a
14  company firing all its employees or being acquired and, you
15  know, the people that had the experience are gone.  That
16  hypothetical is not what's in the record here.  That parade of
17  horribles is not the case in front of the Court.  The case in
18  front of the Court is the one that the Court knows and we've
19  been discussing.

20      Finally I want to emphasize that to the extent the
21  Forest Service chose to rely on the experience of Pulseline's
22  guides and owner at another operator, H2O Guides, there is
23  nothing in the record that shows that that entity successfully
24  operated in compliance with its permits and it satisfied these
25  criteria.  The records cite that Ms. McIntyre cited for that

```
 1    point was 325A to 3259.  That's Pulseline application.  I've
 2    seen it.  It's Pulseline's saying that that happened in the
 3    past.  It's not the records and proof that it actually did
 4    happen in the past.  That in a nutshell is how the Forest
 5    Service relaxed the criteria for Pulseline and not Silverton.
 6           We haven't addressed our FOIA claim.  I don't know if
 7    the Court would want to hear about that?
 8           THE COURT:  I mean, we can discuss it.  I think I had
 9    one thought, which was trying to determine -- I mean, is
10    essentially Silverton's position here that because it was
11    provided by Forest Service after your complaint that therefore,
12    it's an acknowledgement on the Forest Service's part that you
13    were entitled to it as part of your FOIA request?  And it is, I
14    guess -- is it substantial or is it not insubstantial?  I guess
15    those are my two questions.  So if you'd like to address it
16    that's fine.
17           MR. WILLIAMS:  Yes, Your Honor.  The Ninth Circuit
18    case law on this is the *First Amendment Coalition* case at 878
19    Fed F.3d 1119.  And FOIA was amended at some point in time to
20    provide for exactly this circumstance.  Where a person or an
21    entity submits a FOIA request and the agency doesn't provide
22    the documents, but then after the requester files a lawsuit the
23    agency gives the documents to the requester before the Court
24    rules.
25           That's exactly what happened here.  And FOIA, the very
```

1   particular provision we cited in our briefing, which I think is
2   5 U.S.C. 552(a)(b)(E), if I got that right.  I might have that
3   a little bit wrong.  But that says that the Court can award
4   attorneys fees, and we respectfully request that the Court
5   does, if the agency changes its position.
6           Now the Ninth Circuit said how do you tell when an
7   agency changed its position under facts like this, where
8   there's never been a formal response to the FOIA request.
9   Which by the way was filed 863 days ago today.  And the answer
10  is if the agency gives the information to the requester in the
11  lawsuit, the test is if the Court determines that the filing of
12  the action could reasonably have been regarded as necessary to
13  obtain the information and the filing of the action had a
14  substantial causative effect on the delivery of the
15  information.  We think that happened here.
16          THE COURT:  And, look, I don't want to belabor this
17  point.  I guess my perspective, and, you know, I have some
18  familiarity with FOIA.  I was the head lawyer for DOI, when we
19  were permitting ANWR, so I'm familiar with the process.  But
20  here it does seem distinguishable because, one, under Rule 26,
21  again this is more broadly speaking, the courts' perspective I
22  think district-wide is to encourage particularly disputes as it
23  relates to discovery.  I recognize this isn't your traditional
24  litigation.  But nevertheless there's always going to be a back
25  and forth as far as ongoing negotiations as to what documents

1    may or may not be a byproduct of the litigation.

2          And so I think what I struggle with here is this idea

3    that, you know, because the FOIA complaint isn't in and of

4    itself in a vacuum, that it could be the Forest Service or DOJ

5    is providing a great deal of information to try to move the

6    litigation forward, and not as an acknowledgment, one, that

7    this information was due under the FOIA request or I guess to

8    avoid adverse decision.

9          And then also I don't know that the contents here

10   wouldn't be defined as not insubstantial, but I appreciate

11   arguments and the distinctions.

12         Ms. McIntyre, I'm now going to turn to you again for

13   about five minutes.  Anything would you like to reinforce or

14   address?  The floor is yours.

15         MS. MCINTRYE:  Thank you, Your Honor.

16         The Forest Service decision to select Pulseline as a

17   heli-ski operator was not arbitrary and capricious.  They put

18   forward a hardy, 147-page proposal and plaintiffs simply did

19   not.  This would be a different case if plaintiff were arguing

20   that the Forest Service had incorrectly analyzed other

21   operational criteria, had not provided it its due regard in

22   terms of safety criteria or environmental resource criteria.

23   But plaintiff is only addressing these three criteria that look

24   towards past permitting experience.

25         The Forest Service made its decision here based on

1   these applications as a whole, based on that prospectus goal as
2   a whole.  And it picked the strongest overall applications with
3   an eye towards those main points.  Safety, we're talking about
4   a very hazardous sport, in terms of applying its expertise, and
5   providing for recreation, again safe recreation.  And
6   Pulseline's proposal simply is more robust in this regard.  And
7   then also minimizing impacts to Forest Service lands.  And
8   again, that's something that Pulseline's proposal did well.
9           In regard to Silverton's argument as to, you know, one
10  panelist had rankings that were sort of an outlier, that kind
11  of argument, I think that only highlights more for the Court
12  that again, the process that they're focusing on are these
13  review recommendations.  These non-binding recommendations that
14  the panel makes to the decisionmakers.  They go through the
15  process of collecting references.  And then they take a look at
16  those applications and then they're before the decisionmaker to
17  look at those applications in full.  Which is what Supervisor
18  Schramm did here, and he took a very detailed review of both of
19  these applications and took a look at plaintiff's arguments and
20  in that regard, broke it down the way that plaintiff's argument
21  presented it to address these categories and concerns.  And his
22  decision was reasonable and considered all the facts.
23          So again, notably this process is completed through
24  applications.  So in terms of evidence of Pulseline's
25  experience and their narrative form describing how their

relationship with the prior permit holder and that they were in

compliance.  That's part of their written application.  That's

part of their representation to the Forest Service.  So it's

not as if you can just wave it away as nothing.  In regards to

using it as a basis for determining whether or not this

decision was reasonable.

And then also, it's not to be discounted that the

Forest Service can't rely simply on a company saying you, you

know, I have a strong reputation, rely on my reputation.  They

have to rely on documents.  If something goes wrong out there

heli-skiing in the back country in the middle of winter and

somebody files a tort suit or some other -- the Forest Service

doesn't want to say, well, they had a really good reputation,

word of mouth.  You know, they've been around the block.

So these things have to be put in the written

application.  That's the process.  That's how the applicant

makes its case to the Forest Service.  And that process then

moves through this non-binding panel.  Goes to the

decisionmaker, who has complete discretion to select

applicants.  And again we don't know below, why three were

picked as to four, because we just don't have those records.

And I imagine that there's probably important information about

capacity or something, and I'm not going to speculate, but we

don't have that information.  That's all part of the

discretionary process.

1          And then the question is here after the whole process,

2    after the opportunity for internal appeal by plaintiffs, for

3    them to put forward as much information as they desired, which

4    they did, then what is the final decision.  The ultimate

5    question is whether that decision was reasonable.  And here it

6    is reasonable and is it really supported by the facts.  You can

7    see that just reading Pulseline's proposal and comparing it to

8    plaintiff's proposal, and those are the two key documents that

9    are at issue here.

10          So just in conclusion, the Forest decision was

11   reasonable, well supported, and certainly not arbitrary or

12   capricious.  Pulseline put forward a great and detailed

13   proposal.  And plaintiff relied heavily on the assumption that

14   its corporate longevity would speak for itself.  It put forward

15   a slimmer summary proposal and they're dissatisfied with that

16   business choice.  It's our position that the Court should

17   affirm the Forest Service's decision.

18          THE COURT:  Thank you, Ms. McIntyre.

19          And finally, Mr. Garden, anything briefly you would

20   like to say or comment on?

21          MR. GARDEN:  Yes, Your Honor.  Thank you.

22          And briefly, I just want to first refer to

23   Mr. Williams' comment with regard to the statements in

24   Silverton's proposal with regard to the past experience of its

25   employees, particularly Mr. Brill.  To be clear, the plaintiff

1  in this case, Silverton was formed in 2008 as a corporate

2  entity in Colorado.  But if you look at those pages of the

3  Silverton proposal that I referenced, Silverton referring to

4  Mr. Brill's experience all the way back to the 1999.  So I

5  believe the record supports my point that when you look at the

6  parties' position as far as their interpretation of the

7  prospectus before this dispute arose, it's very clear that

8  Silverton believed that those records of past experience also

9  included the experience of employees.

10        Now you made the point, referred to the fact that

11  there didn't seem to be much daylight between Silverton and

12  Pulseline evaluations.  Actually I think the record shows there

13  is a fair amount of a daylight between the two when it comes to

14  experience in Silverton's favor.  Which, if you focus on the

15  three criteria that Silverton had focused its case on, which is

16  the W-1, O-1, and O-2.  With regard to the W-1, first of all,

17  Silverton won all three of those.  So really Silverton's

18  argument that they should have won it by more.  I can't imagine

19  a more discretionary -- this need to have -- they did win.

20  They're contending not by enough.

21        But if you look at for example criteria W-1, and this

22  is set out in the administrative record at pages 1933

23  through 1959, Silverton actually got a higher -- a higher

24  result than Pulseline by 1.25.  That was the gap.  That's a big

25  gap.  So there's quite a bit of daylight there.  On this O-1

1   criteria, Silverton's proposal got point 5 higher score.  And

2   then on O-2.25, I think the record does show there was a fair

3   amount of daylight between the two.  But importantly, the

4   fundamental issue that Silverton's making that they were

5   better, Forest Service agreed they were better.  But the

6   dispute here is about how much better.  And I think that the

7   reasons that the government counsel pointed out, it's not as

8   large as Silverton believed it to be.

9         Two other quick points, Your Honor.  I just want to

10   ensure that the Court is aware that with regard, and I know we

11   didn't touch on this.  It may not be relevant to your decision.

12   But with regard to the issue of the allegation that Pulseline

13   did not comply with the overcompensation law, I just want to

14   make sure that the Court's aware that the search status

15   Silverton did, which is set out at administrative record

16   page 257, was not of a government database, much less the

17   Alaska database.  It was some private database.

18         Which explicitly says on the first page, just because

19   there's an absence of records does not mean that the employer

20   does not have insurance.  I just wanted to make sure the Court

21   is aware that that's not an official database that was used for

22   that search.

23         And my last point, Your Honor, is just simply with

24   regard to the tax lien issue, which was raised and talked about

25   on the briefs, but not talked about today.  I just want to make

 1    sure that the Court is aware that there was no conviction.  So

 2    if you recognize that as a lien, which as the record shows

 3    was -- but regardless when you go through the criteria in the

 4    prospectus, none of that criteria apply to that.  So that's

 5    also not a relevant issue.

 6          I have other points, Your Honor, but they weren't

 7    talked about today.  So I'm going to assume they're are not

 8    material, and I'm going to leave it at that.

 9          THE COURT:  Thank you, Mr. Garden.  And it may not be

10    that your other points weren't material as much as perhaps I've

11    already made my mind up.

12          But anyhow, I appreciate everyone's candor today,

13    their thoughts, their experience, their knowledge.  I

14    appreciate your time.  I know we've been at it for quite a

15    while, but it's this type of discourse that I think helps me

16    get a better understanding of those shades of gray, in between

17    the parties arguments.

18          With that being said, thank you again.  I hope you

19    have a good afternoon.

20          And, Madam Clerk, we may go off record.

21          DEPUTY CLERK:  All rise.  This matter is adjourned.

22    This Court now stands adjourned subject to call.

23          (Whereupon, the Court adjourned at 2:13 p.m.)

24                          --oo0oo--

25

```
 1                          CERTIFICATE

 2       I, Stacy M. Baldwin, Federal Official Court Reporter in and
     for the United States District Court of the District of Alaska,
 3   do hereby certify that the foregoing transcript is a true and
     accurate transcript from the original stenographic record in
 4   the above-entitled matter and that the transcript page format
     is in conformance with the regulations of the Judicial
 5   Conference of the United States.

 6       Dated August 10, 2023.

 7

 8                              /s/ Stacy M. Baldwin
                               STACY M. BALDWIN, RCR, RMR
 9                             FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```